Filed 8/7/26  Beaver v. The Regents of the Univ. of Cal. CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| MATTHEW BEAVER,<br>    Plaintiff and Respondent,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br>    Defendant and Appellant. | C101258<br><br>(Super. Ct. No. 34202000283227CUMMGDS) |

The Regents of the University of California (the Regents) appeal from a judgment following a jury trial in favor of respondent Matthew Beaver in his medical malpractice action.  The Regents do not challenge the jury's findings on liability or damages.  The sole issue on appeal is whether the trial court abused its discretion in adopting a schedule of annual payments that the Regents must make to compensate Beaver for his future medical and home care needs.  (Code Civ. Proc, § 667.7.)[1]

FACTUAL AND PROCEDURAL BACKGROUND

Because the only aspect of the judgment that the Regents challenge is the schedule of periodic payments for Beaver's future care and medical expenses, we need not recount the underlying facts of the case.  It suffices to say that, in his medical malpractice lawsuit

---

[1]  Undesignated statutory references are to the Code of Civil Procedure.

1

against the Regents, Beaver alleged he suffered permanent brain damage due to negligent medical care he received at UC Davis Medical Center. Beaver was 23 years old when this medical care was provided in 2019, and it was undisputed at the 2023 trial that he had a remaining life expectancy of 53.2 years, i.e., past his 80th birthday.

Beaver argued to the jury that the future cost of his lifetime care and medical needs was over $37 million. The Regents argued the future cost was slightly more than $8 million. The discrepancy was due to Beaver's calculation of 168 hours a week (24 hours a day) of home care assistance in contrast to the Regents' calculation of 15 hours a week of such care.[2]

By special verdict, the jury found the cost of Beaver's future care and medical needs was roughly $9.5 million (with a present cash value of roughly $4.9 million).[3] Pursuant to section 667.7, the Regents moved for periodic payments of future care and medical expenses, proposing a schedule of increasing annual payments for the duration of Beaver's life expectancy that began with a payment of roughly $98,000 in 2024, a penultimate payment of roughly $294,000 in 2076, and a final payment for the remaining

---

[2] Beaver's expert witness in medicine and life care planning opined he would need home care assistance 24 hours a day, in part because it was impossible to "predict the nights that there is going to be a problem" and Beaver will "not know how to handle it." The Regents' expert witness in physical medicine and rehabilitation, Dr. Kara Flavin, opined he would need 10 to 15 hours of home care assistance each week, in part because Beaver was "independent in … his basic activities of daily living -- dressing, bathing, grooming," but would need help with transportation, "heavier cleaning chores," and "intricate cooking activities."

Dr. Flavin also (1) described her experiences (a) treating poststroke patients who lived independently and (b) counseling poststroke patients and their families about increasing the independence of patients over time and (2) opined that Beaver had the "potential to return to driving" if that was something he wished to pursue.

[3] The jury also found Beaver's future lost earning capacity was roughly $3.8 million (with a present cash value of roughly $2.4 million).

2

$60,000 in 2077. With that last payment in 2077, Beaver would have received the amount that the jury awarded—roughly $9.5 million.

Beaver opposed the Regents' desired payment schedule, arguing it "defie[d] the jury's finding as to the present cash value" of his future care and medical expenses and was inconsistent with the notion that was supported by the trial record: "much of … Beaver's care is needed sooner rather than later and … Beaver may be able to live more independently (if not completely independently) later in life."[4] Beaver proposed several payment schedules for the trial court's consideration, each of which was based on the purchase of an annuity in the amount of the jury's present cash value determination (roughly $4.9 million), resulted in total future payments amounting to the future value determination (roughly $9.5 million), and had *equal* payments from start to finish.[5]

The trial court determined: (1) the jury award " 'show[ed] the jury agreed with some but not all of' " the opinions of the parties' experts about future care needs; (2) " '[t]he record … supports a finding that much of … Beaver's care is needed sooner rather than later and that … Beaver may be able to live more independently (if not completely independently later in his life)' "; (3) "[t]he fact that the jury awarded less than" what Beaver sought for future care and medical expenses "supports a finding that Dr. Flavin's testimony should be credited and considered in the determination of the periodic payment schedule"; and (4) it "agree[d] with [Beaver] that a payment schedule that terminates at age 62 is appropriate based on the evidence presented with" the Regents' motion. Accordingly, the trial court ordered a schedule of equal annual

---

[4] Beaver indicated that the support for this notion was to be found in Dr. Flavin's testimony.

[5] One proposal provided for payments for about 27 years (until Beaver turned 54 years old), another proposal provided for payments for about 30 years (until Beaver turned 58 years old), a third proposal provided for payments for about 34 years (until Beaver's 62nd birthday).

3

payments of $276,000 from 2024 through 2057, with a final payment for the remaining $94,297 in 2058, at least 19 years short of Beaver's projected life expectancy. Judgment was filed in April 2024. The Regents appealed.

DISCUSSION

I

*Legal Background*

" 'In May 1975, the Governor—citing serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums— convened the Legislature in extraordinary session to consider measures aimed at remedying the situation. In response, the Legislature enacted the Medical Injury Compensation Reform Act of 1975 (MICRA) … , a lengthy statute which attacked the problem on several fronts.' [Citation.] 'In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation.' " (*Chan v. Curran* (2015) 237 Cal.App.4th 601, 607, fns. omitted.)

"In the Legislature's view, '[t]he continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation.' [Citation.] 'Accordingly, MICRA includes a variety of provisions,' " including section 667.7, " 'all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence.' " (*Chan v. Curran*, *supra*, 237 Cal.App.4th at pp. 607-608.)

4

Relevant here, section 667.7 provides that in any medical malpractice, the trial court "shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds two hundred fifty thousand dollars ($250,000) in future damages." (§ 667.7, subd. (a).) The statute further provides: "By authorizing periodic payment judgments, it is the … intent of the Legislature that the courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff … for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended." (§ 667.7, subd. (f).)

"Section 667.7 requires the jury to designate that portion of its verdict allocated to future damages [citation], but entrusts the establishment of the schedule, i.e., the duration, frequency and amount of the periodic payments, to the discretion of the court. The court then structures a periodic payment schedule, using the gross amount of future damages as 'the pivotal figure' in its determination. [Citations.] Consequently, whatever plan the court fashions for periodic payment of the judgment, it must provide for a total payout of accrued and future damages to the plaintiff in an amount which equals the gross award, less statutory attorney fees [citation], nonrecoverable costs, and any valid liens against the judgment. [Citation.] 'The plaintiff is entitled to no less, and to no more.' " (*Holt v. Regents of University of California* (1999) 73 Cal.App.4th 871, 880-881 (*Holt*).)

"In a MICRA case the *present* value of an award of future economic damages is used in limited circumstances, such as … when the defendant wants to pay the judgment in a lump sum and obtain a satisfaction of judgment" and "in calculating attorney fees." (*Holt*, *supra*, 73 Cal.App.4th at pp. 878, italics added.) "However, the present value cannot be used as the figure to be periodized; periodic payments are based on the *gross*

5

amount of the future damages." (*Id.* at p. 879.) If the present value of an award were periodized " 'a plaintiff might not be fully compensated for … future losses; the judgment, in effect, would be discounted twice: first by reducing the gross amount to present value and second by deferring payment.' " (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 639.)

## II

### *Analysis*

The Regents' first challenge to the periodic payment schedule that the trial court adopted is that there is no evidence that Beaver's future care and medical needs will cease when he turns 62. We agree.

Periodic payments need not be coextensive with a medical malpractice plaintiff's life expectancy. (*Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1397 [because § 667.7, subd. (f) contemplates the fashioning of a periodic payment schedule " '*for whatever period is necessary*,' " the schedule need not "directly correspond to … a plaintiff's life expectancy"].) This is because some needs may be more immediate and then may diminish over time. (*Atkins*, at p. 1398 ["Because the prosthesis and wheelchair are immediate needs and the psychiatric care is required for the first two years after trial, the record supports payment over a period … less than" the plaintiff's projected life expectancy].) But when "experts for both parties agree[] that except for certain immediate expenses, [a plaintiff's] medical needs [will] be constant and uniform throughout [the plaintiff's] life, and there is no evidence indicating why these expenses would be unnecessary for" the last years of the plaintiff's projected life expectancy, a payment schedule that does not provide medical and supportive care for the plaintiff "throughout her life" is an abuse of discretion and "must be restructured." (*Holt*, *supra*, 75 Cal.App.4th at p. 882; *id.* at p. 881 ["A precise match between future losses and compensation is not required, but there must be evidence to uphold the court's payment schedule."].)

Here, Beaver's expert opined he would need 24 hours a day of home care assistance, while Dr. Flavin opined he would need 10 to 15 hours a week. And even if aspects of Dr. Flavin's testimony could support the notion that Beaver might be able to live independently later in life, we see nothing in the record that would support a determination of *when* he will be able to do so. Indeed, Beaver points to nothing in the record indicating why his home care needs might cease at age 62 (as opposed to age 52 or age 72). One payment schedule that Beaver proposed in his opposition to the Regents' motion contemplated a final payment when he is 62. But that schedule was based entirely on *financial* considerations, not Beaver's future care needs. As mentioned above, the starting point for the payment schedules that Beaver proposed was the purchase of an annuity in the amount of the jury's determination of the present value of Beaver's future care and medical expenses. The declaration that Beaver provided in support of his proposed payment schedules was signed by a licensed life and accident and health or sickness agent who represented that the proposed "annuity options … reconcile the present cash value award and the future value award."

Given the absence of evidence for a determination regarding when Beaver may be able to live independently, we are compelled to rule the trial court abused its discretion in adopting a periodic payment schedule that ends when Beaver is 62 years old. (*Holt*, *supra*, 75 Cal.App.4th at p. 882.)

The Regents ask us to reverse and remand to the trial court for determination of an alternative payments schedule guided by the evidence and Beaver's future needs. That is what we will do. And because we can do so by ruling the trial court abused its discretion in adopting a periodic payment schedule that ends when Beaver is 62 years old, we need

7

not adjudicate the Regents' other challenges to the payments schedule.[6] (See *Ruffier v. Volcano Hills Road Maintenance Assn.* (2025) 117 Cal.App.5th 899, 909, fn. 6 ["we limit our focus here to" a specific issue "because we can resolve this appeal on that straightforward basis"]; see also *People v. Buza* (2018) 4 Cal.5th 658, 693 [" ' "if it is not necessary to decide more, it is necessary not to decide more" ' "].)

## DISPOSITION

The judgment is reversed and remanded with directions to restructure the periodic payment of the judgment in accordance with this opinion, the evidence presented during trial, additional evidence (if any) that the trial court decides to accept on remand, and Beaver's future needs.

/s/
_____
BOULWARE EURIE, J.

We concur:

/s/
_____
EARL, P. J.

/s/
_____
MESIWALA, J.

_____

[6] On remand, the trial court may invite the parties to present more evidence. (See *Gorman v. Leftwich* (1990) 218 Cal.App.3d 141, 150, 153 [the appellate court reversed and remanded for the trial court to determine the gross amount of future medical and related damages and fashion a schedule of periodic payments, and there was no need for a new trial, because the trial court could "consider the trial testimony and, if necessary, supplement that evidence with *postverdict testimony* in order to … fashion a schedule of periodic payments"; there was "nothing in such a procedure which denie[d] either party its constitutional right to jury trial so long as the resulting judgment [fell] within the parameters of the verdict and the integrity of the fact finder's determination [was] maintained" (italics added)]; cf. *Salgado v. County of Los Angeles*, *supra*, 19 Cal.4th at p. 648 [quoting this reasoning in *Gorman v. Leftwich* with apparent approval].)